Mary Jo O'Neill, AZ Bar #005924
James Driscoll-MacEachron, AZ Bar #027828
Wasan Awad, AZ Bar #025352
Michael Baskind, AZ Bar 030810
**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Phoenix District Office**
3300 N. Central Ave., Suite 690
Phoenix, Arizona 85012
Telephone: (602) 640-5032
Fax: (602) 640-5009
Email: mary.oneill@eeoc.gov
james.driscoll-maceachron@eeoc.gov
wasan.awad@eeoc.gov
michael.baskind@eeoc.gov

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>Scottsdale Wine Café, LLC d/b/a 5th and Wine,<br><br>Defendant. | Case No. 2:17-cv-00182-JJT<br><br>**MOTION REQUESTING DAMAGES AND INJUNCTIVE RELIEF** |

Pursuant to the Court's request at the default hearing on February 6th, 2018, Plaintiff Equal Employment Opportunity Commission submits this motion seeking damages for Wyatt Lupton and Jared Bahnick as well as injunctive relief against 5th & Wine. 5th & Wine subjected Lupton to sexual harassment and retaliation, and it subjected Bahnick to sexual harassment, all in violation of Title VII. As a result, both Lupton and Bahnick suffered significant emotional distress, and the evidence also shows that 5th & Wine acted with reckless disregard for their federally protected rights. The EEOC therefore seeks $50,000 each in compensatory and punitive damages for Lupton and Bahnick. The EEOC also seeks injunctive relief to ensure that 5th & Wine will not

-1-

discriminate against others in the same way.

**I.    Damages**

Lupton and Bahnick should each receive the full $50,000 in compensatory and punitive damages they are entitled to under 42 U.S.C. § 1981a(b)(3)(A).[1] Lupton endured significant emotional pain and suffering due to 5th & Wine's harassment and retaliation, while Bahnick similarly experienced ongoing emotional pain and suffering as a result of the harassment he experienced at 5th & Wine. 5th & Wine also acted with reckless indifference to both of their federally protected rights. Lupton and Bahnick shouldered the effects of the harassment both during and after their employment at 5th & Wine. Indeed, the conduct they endured was so egregious that had this matter gone before a jury, it may well have awarded Lupton and Bahnick more than the limits set out in section 1981a that would then be reduced to $50,000 by the court. *See Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014)(reducing Title VII jury verdict of $868,750 to $300,000 under section 1981a).

Section 1981a provides for compensatory damages in the form of "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). A claimant's testimony alone is sufficient to support an award of compensatory damages. *See Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1039-1041 (9th Cir. 2003) (affirming compensatory damages awarded based upon plaintiff's testimony); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 513 (9th Cir. 2000) (holding that the Supreme Court and the Ninth Circuit do not require emotional damage awards be supported by objective evidence).

Punitive damages are also available under section 1981a to a victim of unlawful discrimination under Title VII, if the employer "engaged in a discriminatory practice or

---

[1]When an employer has more than 15 but less than 100 employees the statutory cap on damages is $50,000 per aggrieved individual. 42 U.S.C. § 1981a(b)(3)(A).

discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534, 536 (1999), the Supreme Court rejected the argument that punitive damages are only available when an employer's conduct was "egregious." In the Ninth Circuit, intentional discrimination is generally sufficient to establish a right to punitive damages. *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 515 (9th Cir. 2000). An employer may defend itself against punitive damages by showing that it has a written anti-harassment policy and that it implements those policies. *Id*. at 517. Additionally, punitive damages are appropriate when the factfinder takes into consideration that "they have the capacity to deter defendants and others *similarly situated…*" *Settlegoode v. Portland Public Schools*, 371 F.3d 503, 519 (9th Cir. 2004)(emphasis added). Indeed, the Ninth Circuit model jury instructions state "[t]he purposes of punitive damages are to punish a defendant and to deter similar acts in the future." Instruction 5.5, Ninth Circuit Manual of Model Jury Instructions (2007).

### A. Wyatt Lupton should receive $50,000 in compensatory and punitive damages.

Wyatt Lupton endured cruel and relentless harassment based on his sexual orientation during his employment with 5th & Wine, and his emotional distress was exacerbated by the retaliation he suffered there as well. Wyatt Lupton was a fulltime student when he started working for 5th & Wine. *See* Lupton declaration, attached as Exhibit A, at 2. He was subjected to severe sexual harassment and retaliation that resulted in tears of frustration, fear, humiliation, and anxiety that continued well after his employment with 5th & Wine ended. *Id*. at 23-24, 26-28. 5th & Wine harassed Lupton because of sex, specifically his sexual orientation. S*ee* Dkt. 37-1. Even before he began his first shift, 5th & Wine characterized him as the "…gay employee." Lupton decl. at 3. His coworkers repeatedly made explicit sexual comments to him such as "You only like big dicks don't you? I can tell by the way you walk" or "A blowjob makes your whole day but anal sex makes your hole weak." *Id*. at 5. Moreover, the harassment wasn't

limited to offensive comments like these; it also included obscene gestures and inappropriate physical touching. *Id.* at 6-8. For example, some of the employees would motion with their fingers in a manner that mimed sexual penetration. *Id*. at 8. The prep cooks would also sneak up behind him and run their fingers up and down his spine, and one of his coworkers even did so in front of customers. *Id*. at 8.

Additionally, supervisors and managers participated in the harassment and in some instances instigated it. *Id*. at 15-18. For example, head chef Josh Yazzi would announce in the workplace that Lupton only liked big penises. Dkt. 1 at 21(l). Yazzi would also refer to Lupton as a "sissy," "faggot," and "pussy." Lupton Decl. at 18. When Lupton asked him to stop, Yazzi would tell him "What, you don't like being called a faggot? I thought you would like it you pussy ass little faggot, since that is what you are." *Id*. General manager and supervisor, Scott Yanni, also called Lupton a fag on at least three different occasions. *Id*. at 16.

Lupton complained about the harassment, but management did nothing to stop the harassing conduct. *Id*. at 11, 13. 5th & Wine managers did not put a stop to the harassment they saw other employees inflict on Lupton, and Lupton's direct supervisor Rachel Barkley told Lupton not to complain, and specifically not to complain to the general manager. *Id*. at 13. Because his complaints were not being taken seriously, Lupton ultimately sought legal assistance, and, despite the antiretaliation provisions of Title VII, 5th & Wine terminated him because he did so. *Id*. at 20.

The harassment and retaliation caused Lupton intense and ongoing emotional damage. Lupton regularly called his grandmother after he finished his shifts at 5th & Wine and tearfully described to her the type of harassment he had endured that day. *Id*. at 24. The harassment and retaliation were so severe that they changed his personality and caused him to become cynical, and negative. *Id*. at 23. Because of the emotional toll the harassment was taking on him, Lupton began to drink heavily. *Id*. at 21. According to Lupton, he would use alcohol as a tool to help him sleep and block out the harassing conduct he was subjected to every time he went to work. *Id*. On the days that Lupton

arrived to work early, he usually sat in his car stressing about work. *Id*. at 22. The stress usually caused him to start sweating as he waited for his shift to start. *Id*. When he started his shifts, he would already be distressed about being at work and he would make a point of not going by the kitchen because he was anxious about the harassment that would be directed his way. *Id*.

Despite the harassment, Lupton was afraid to leave. *Id*. at 25. Lupton felt he could not leave 5th & Wine because Yanni, the general manager, gave Lupton and other employees the impression that he was so well connected in Scottsdale that he would know if any of them applied at other businesses. *Id*. Lupton thus felt that no one else would hire him and he was trapped at 5th & Wine. *Id*.

Lupton is still impacted by the harassment. He is always anxious and on edge in his present-day workplaces, and he has a constant fear that he will be treated negatively by his coworkers due to his sexual orientation. *Id*. at 26. He is constantly paranoid that his supervisors will treat him differently and negatively because of his status as a gay man. *Id*. His memories of his time at 5th & Wine give him a crippling sense of anxiety every time he goes near the old 5th & Wine location. *Id*. at 27. He has a physical reaction to being in that location, including tightness in his chest and on at least three different occasions when he has driven by the old 5th & Wine location he has had such severe anxiety that it has caused him to vomit. *Id*. Thus, he goes out of his way to not drive by that area in Scottsdale and asks his friends to avoid the area. *Id*. Lupton also becomes tearful when he relives the memories of his time at 5th & Wine. *Id*. at 28. Unfortunately, the harassment he endured has resulted in a constant fear, and it makes it hard for him to form interpersonal relationships both within the workplace and in social environments. *Id*.

5th & Wine also acted with reckless disregard for Lupton's federally protected rights when its supervisors and employees harassed and retaliated against Lupton. While egregiousness is not required to grant punitive damages, the harassment and retaliation here was clearly egregious. *See Kolstad,* 527 U.S. at 536. Lupton was exposed to severe

sexual language, gestures, and he was physically touched in a sexual manner. Lupton decl. at 5-8, 16-18. Moreover, when he complained to management he was reprimanded for complaining and told not to complain. *Id*. at 13. Despite this, he still stood up for himself and sought legal protection, but then 5th & Wine terminated him in retaliation. *Id*. at 20. It is clear that management was on notice of the harassing conduct, and in fact Lupton's coworker Jared Bahnick told management that the way Lupton was being treated was illegal. *Id*. at 11-13, 18; Bahnick Declaration, attached as Exhibit B, at 5. But, they ignored Bahnick and instead, participated in the harassment. *Id*.; Lupton Decl. at 16-18. Moreover, while 5th & Wine may have protected itself by showing that it implemented an anti-harassment policy, it cannot do so here because it simply did not have any policies. *See Passantino,* 212 F.3d at 517. Lupton was never trained on sexual harassment and was never given any instructions on complaint procedures. *Id*. at 4. Additionally, where punitive damages are at stake, a factfinder may consider the message it will send to both the defendant and others who are "similarly situated." *Settlegoode v. Portland Public Schools*, 371 F.3d 503, 519 (9th Cir. 2004). Granting punitive damages here will send a message to 5th & Wine that their conduct was abusive and impermissible. It will also send a message to other employers that this type of behavior in the workplace will not be tolerated.

Lupton's exposure to the sexual harassment and retaliation has had a significant impact on his life. Had this case been presented to a jury it is very possible that the jury would have returned a verdict well above the statutory cap of $50,000 permitted by 42 U.S.C. § 1981a(b)(3)(A). In order to make Lupton whole after the egregious harassment and retaliation he endured in reckless disregard of his federally protected rights, the EEOC requests that the Court award Lupton $50,000 in compensatory and punitive damages.

**B. Jared Bahnick should be awarded $50,000 in compensatory and punitive damages.**

Jared Bahnick was also subjected to egregious and continuous harassment.

Bahnick's coworkers associated Bahnick with Lupton, perceived him as gay, and as non-conforming with sex stereotypes. Because of this, he was subjected to severe sexual harassment at 5th & Wine. Bahnick is not gay, but he felt he had to announce his sexual orientation at the workplace in an attempt to avoid harassment. Bahnick Decl. at 4. However, his coworkers did not believe him and continued to harass him. *Id*. In fact, they told him "It's ok, we know you're gay." *Id*. Bahnick stood up for Lupton when Lupton was being harassed and so some of his coworkers associated Bahnick with Lupton and thought that he and Lupton were more than friends. *Id*. at 5. Bahnick's coworkers regularly made sexually explicit comments about Bahnick and specifically about his body. *Id*. at 6-7, 10. For example, they would say to him "You make me so hard" or "I like your butt and I would like to fuck it" and "You're beautiful" or "You would be a really beautiful woman." *Id*. at 7.

  His coworkers also made kissing noises and licked their lips when they saw him. *Id*. at 6. His coworkers called him a "faggot" and other offensive names. *Id*. They also repeatedly slapped his butt and penis. *Id*. at 6, 8-9. When he told them that he would punch the next person who touched him, one of his coworkers began to pinch and twist the skin on his arms regularly for about two weeks. *Id*. at 9. The pinching would cause Bahnick to scream and left bruises on his arms. *Id*. The harassment Bahnick experienced was not limited to his coworkers; 5th & Wine managers also harassed him. For example, on one occasion Yanni commented on Bahnick's hair and told him "Are you sure you weren't giving Wyatt [Lupton] some head before you came to work?" *Id*. at 10.

  When Bahnick complained to Yanni about the harassment at 5th & Wine, Yanni ignored Bahnick and did not make a written record of the complaints despite Bahnick's explicit request that he do so. *Id*. at 12. Bahnick believes that because Yanni ignored his complaints and did nothing about the harassment, Bahnick's coworkers felt empowered to continue harassing him and did so in a very open manner. *Id*.

  The severe sexual harassment Bahnick was exposed to at 5th & Wine had a profound impact on him. Because of the harassing conduct, Bahnick was fearful of

going into the kitchen and exposing himself to more harassment. *Id*. at 11. He would ask other servers to pick things up for him from the kitchen, which meant that he would receive fewer tips because simple tasks would take longer. *Id*. Bahnick would leave work mentally and emotionally worn down after having spent his entire shift worrying about whether he needed to physically protect himself from inappropriate touching and abuse. *Id*. at 18.

Bahnick felt humiliated and emotionally distressed by the harassment at 5th & Wine. He felt the environment at 5th & Wine was toxic, and so he stopped taking extra shifts at work and would only work his regularly scheduled shifts. *Id*. at 19. When he did work his regularly scheduled shifts, he would sometimes end up leaving much later than his assigned hours because he didn't feel comfortable around the harassers and felt he had to perform his work tasks away from them. *Id*. This meant he either had to wait for them to leave the restaurant or work in different sections of the restaurant. *Id*. Additionally, because Bahnick lived in Scottsdale during his employment with 5th & Wine, he feared that he would run into his harassers if he went out much, so the harassment also impacted his social life negatively. *Id*. at 20.

The harassment has continued to have a negative impact on Bahnick even after he departed from 5th & Wine. After he quit, Bahnick shut down for about three months; he didn't leave his home, and he lost contact with family and friends. *Id*. at 22. He stopped working and remained at home until he ran out of money. *Id*. He worried that he wouldn't get a job because he believed potential employers would contact Yanni when they saw 5th & Wine on his resume, and that would result in Bahnick not getting the job. *Id*. at 23. His time at 5th & Wine has impacted Bahnick in other ways as well. For example, Bahnick believes his personality changed after his time at 5th & Wine, and his friends and family have told him the same. *Id*. at 24. While he used to be funny, witty, and personable, he has become more reserved and less social in his workplaces. *Id.* at 24-25. He is now always anxious that he will be harassed. *Id*. He was humiliated by the harassment he endured and felt betrayed by his coworkers at 5th & Wine, and he now

views people in general in a more negative light. *Id*. at 16-17. When he remembers his time at 5th & Wine, Bahnick becomes defensive and angry; he can't help but feel powerless because even today he does not believe that he can get justice due to 5th & Wine closing their restaurant during litigation. *Id*. at 27.

5th & Wine also acted with reckless disregard for Bahnick's federally protected rights. Bahnick experienced severe and intolerable harassment in the workplace that in some instances left him physically injured. *Id*. at 8-9. He clearly and on numerous occasions put his coworkers and management on notice that he was unhappy with the harassment he was experiencing. *Id*. at 9, 12. It is also clear that 5th & Wine was a place that would either ignore complaints or retaliate against an employee who complained. Lupton Decl. at 12, 20; Bahnick Decl. at 12. Indeed, chef BJ told Bahnick to stop complaining so he would not get in more trouble. *Id*. 5th & Wine did not have any anti-harassment policies, never provided Bahnick with any EEO training or informed him how to complain if he was exposed to harassment. *Id*. at 3. And management actively knew of the harassment and did nothing to stop it. *Id*. at 10; 12-14. Thus, punitive damages are appropriate. Granting punitive damages would also send a message to fellow employers that this type of harassment is inappropriate in a workplace.

Bahnick's life has been drastically changed by his experiences at 5th & Wine. And he has again been impacted by 5th & Wine when it failed to defend in this action and thus failed to allow him an opportunity to prove his damages at trial. The EEOC believes that if Bahnick had been able to present his case to a jury it is very possible the jury would have returned a verdict well above the statutory cap of $50,000 permitted by 42 U.S.C. § 1981a(b)(3)(A). In order to make Bahnick whole after the egregious harassment he endured in reckless disregard of his federally protected rights, the EEOC requests that the Court award Bahnick $50,000 in compensatory and punitive damages.

## II. Injunctive Relief

The EEOC also requests injunctive relief under 42 U.S.C. § 2000e–5(g), which provides for injunctive relief where "the respondent has intentionally engaged in…an

unlawful employment practice charged in the complaint." Here, the Court has found 5th & Wine liable for harassment and retaliation. Dkt. 37-1. The EEOC therefore requests injunctive relief to prevent further violations of Title VII. *See id.* Specifically, the EEOC seeks an injunction barring 5th & Wine and any of its officers, successors, assigns, or appointees from ever engaging in the egregious discriminatory actions it allowed its employees to engage in here. Based on its experience enforcing Title VII, the EEOC also requests injunctive relief requiring 5th & Wine to institute EEO training, EEO policies, and notice posting to ensure 5th and Wine does not engage in these forms of discrimination and retaliation again. A proposed order is attached as Exhibit C with details on these provisions.

The Court inquired if 5th & Wine was still in business during the default hearing, and the EEOC understands the Court may have the same question with regard to injunctive relief. While 5th & Wine closed its Scottsdale location, 5th & Wine is still listed in good standing with the Arizona Corporation Commission,[2] and the EEOC has not found any evidence that 5th & Wine has filed for bankruptcy. As 5th & Wine does not appear to have dissolved or gone bankrupt, injunctive relief is still appropriate—and essential to ensure additional discrimination does not occur if 5th & Wine opens additional locations.

### III. Conclusion

5th & Wine engaged in severe and continuous harassment against Lupton and Bahnick, and it retaliated against Lupton when he sought legal assistance. 5th & Wine's shameful and inexcusable conduct severely impacted both Lupton and Bahnick at the time, and it has continued to affect them to this day. Both Lupton and Bahnick were forever changed and emotionally damaged by their experiences at 5th & Wine. The Court has already found 5th & Wine liable; to afford Lupton and Bahnick the justice they are due, the EEOC requests that the Court now grant each $50,000 in compensatory

---

[2] http://ecorp.azcc.gov/GoodStanding/CheckStanding?corpId=L15634830.

and punitive damages. The EEOC also requests injunctive relief to effectuate the purposes of Title VII and to prevent 5th & Wine from discriminating against future employees.

RESPECTFULLY SUBMITTED this 2nd day of March, 2018.

MARY JO O'NEILL
Regional Attorney

JAMES P. DRISCOLL-MACEACHRON
Supervisory Trial Attorney

*/s/ Wasan A. Awad*
WASAN A. AWAD
Trial Attorney

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Phoenix District Office
3300 N. Central Ave., Suite 690
Phoenix, AZ 85012
(602) 640-5032

Attorneys for Plaintiff

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2018, the foregoing document was submitted to the Clerk's Office, via the CM/ECF system, for filing and sent to Defendant by U.S. Mail to the address provided below.

Scottsdale Wine Cafe LLC
c/o Rich Sullivan
4400 N Scottsdale Rd., Ste. 9-312
Scottsdale, AZ 85251

*/s/ Wasan Awad*
Trial Attorney